Jo-Ann Barry, an Infant by Richard J. Barry, as Parent and Natural Guardian, et al., Respondents, v Gary A. Manglass et al., Appellants, et al., Defendants.

Gary A. Manglass et al., Appellants, v General Motors Corporation, Respondent.

Robert J. McElroy et al., Respondents, v Gary A. Manglass et al., Appellants.

Robert J. McElroy et al., Respondents, v General Motors Corporation, Appellant.

Second Department, December 6, 1976

*Eugene N. Cavallo, Jr.,* for Gary A. Manglass and another, for plaintiffs-appellants.

*MacDonnell & Calger (Philip Hoffer, Rose L. Hoffer* and *Peter T. Affatato* on the brief), for Gary A. Manglass and another, defendants-appellants.

*Simpson Thacher & Bartlett (Roy L. Reardon* and *Frazer F. Hilder* of counsel), for General Motors Corporation.

*Richard Narducci (Clarence A. Baracks* on the brief), for Robert J. McElroy and others, respondents.

*Hurley, Fox & Selig (Ralph S. Joseph* of counsel; *Harry A. Fox* and *Leo J. Gutterman* on the brief), for Richard J. Barry and others, respondents.

SHAPIRO, J. In these actions based upon negligence and breach of warranty, the jury awarded the plaintiffs Barry a total of $850,000 and the plaintiffs McElroy a total of $19,635

and fixed the liability of the defendant General Motors at 35% and of the defendants Manglass at 65%. Those defendants appeal from the judgments against them and the Manglasses, as plaintiffs, appeal from a third judgment which is against them and in favor of General Motors, entered upon the trial court's dismissal of their complaint when it granted General Motors' motion to set aside the jury verdict in their favor. We reverse the judgments and grant a new trial, but limited to the issues hereinafter set forth.

### THE ACCIDENT

On January 8, 1972 Gary A. Manglass was operating a 1969 Chevrolet Nova in Mount Ivy, Ramapo, New York. He was alone in the car. He made a left turn from Old Route 202 to go south on Route 45, a two-lane, north-south road, with a painted line down the center. The car was proceeding at a speed of 50 to 60 miles per hour either as it started into the turn or when it came into the southbound lane (the eyewitness testimony is not clear as to this). Suddenly the car appeared to be out of control and began weaving from one lane to the other. It struck a vehicle proceeding north which was operated by Beverly McElroy, injuring her and her passengers (her daughter Margo and Joanna and Jo-Ann Barry). Manglass was rendered unconscious and claimed that he had no recollection of the accident or of its immediate antecedents.

The Barrys and McElroys sued Gary A. Manglass and Janice E. Manglass, owner of the Nova, for negligence and they sued General Motors for alleged defects in the car which Gary Manglass was operating. The Manglasses sued General Motors but did not sue Beverly McElroy.

### THE CONTENTIONS OF THE PARTIES

The basis of the claim against General Motors was an alleged defect in the left motor mount securing the engine block to the frame of Manglass' 1969 Nova. Experts testifying on behalf of the Barrys contended that the left motor mount separated into two parts prior to the collision and that that caused the engine to rise above its rotational axis and bind the accelerator linkage, resulting in an open-throttle posture.

General Motors, while admitting that, after the accident, the left motor mount was separated from the framework, contended that that condition was a result of the collision

which, they claimed, was caused by Gary Manglass' loss of control of the car after making the turn at too great a speed. General Motors also contended that, because there was an absence of scarring on the surface of the motor mount, even if the separation had existed prior to the accident, it was not the cause of the malfunction of the accelerator linkage. Further, argued General Motors, motor mount failure would not have had an effect on the steering of the vehicle.

Experts on behalf of the Barrys testified that the motor mount failure preceded the accident and caused an unintended increase in the speed of the car as it was making the turn. However, there is more to these actions than the traditional battle of the experts. As part of the case against General Motors, there were submitted and accepted into evidence, over objection, portions of two recall letters issued to Chevrolet owners by General Motors in March and November, 1972. The first was issued two months after the accident; however, the parties agree, awareness of the accident was not the cause of the issuance of the letters. The second letter was essentially a repeat of the first and was sent to those owners who had taken no action after receipt of the first. The relevant portions of the first letter are as follows:

"Dear Chevrolet Owner:

"This notification applies to 1969 model Chevrolet passenger cars equipped with a V-8 engine except Chevelle and Corvette models.

"We are sending this letter to call to your attention a possible safety hazard which exists should separation of an engine mount occur on your vehicle. If you will take your vehicle to any Chevrolet dealer, restraints will be installed at 'no cost' to you, to eliminate this possible safety hazard. We urge that you do so.

"Your vehicle is equipped with two front engine mounts; one positioned on each side of the engine. An engine mount consists of a rubber cushion sandwiched between two metal plates. It supports and cushions the engine. Since the center portion of an engine mount is made of rubber, it is subject to fatigue from constant flexing during vehicle operation and from engine compartment heat. Replacement of fatigued engine mounts is a part of vehicle maintenance which is the responsibility of the owner.

"The possible safety hazard referred to exists when, as a result of fatigue or collision damage, the rubber portion of an

engine mount has separated. When this condition exists, very rapid acceleration of the vehicle from a stop or from very low speeds can result in the engine rotating sufficiently to interfere with the accelerator linkage and to cause the throttle to be held open temporarily. This can occur suddenly and without warning when the vehicle is in either forward or reverse gear. A sharp left turn during forward acceleration can increase the possibility of engine rotation if the left engine mount has separated.

"If the throttle is unexpectedly held open, prompt reaction on the part of the driver will be required to avoid temporary loss of control of the vehicle. If that should occur, the driver should turn off the ignition and apply sufficient pressure on the brake pedal to bring the vehicle to a stop.

"Torque reaction forces, which can cause an engine with separated mounts to rotate sufficiently to affect vehicle operation, can occur only during very rapid acceleration from a standing start or from very low speeds. It, therefore, is suggested that, except in emergency situations, you avoid such rapid acceleration from low speeds until after restraints have been installed in your vehicle by Chevrolet dealer.

"Chevrolet has developed special restraints for installation in affected vehicles. In the event of engine mount separation, these restraints will limit engine rotation and thereby prevent interference with the normal operation of your vehicle. Installation of these restraints, therefore, will eliminate the possible safety hazard associated with engine mount separation which is described in this letter. * * *

"If, in the future, it is necessary to replace engine mounts on your vehicle, it is important that you install only interlocking type engine mounts. This type of mount limits engine rotation if separation occurs.

"Chevrolet Motor Division, "General Motors Corporation"

General Motors alleges that is was reversible error for the court to admit those letters which were sent pursuant to the Motor Vehicle Safety Act of 1966 and, more particularly, subdivision (a) of section 113 of the Act (US Code, tit 15, § 1402, subd [a]) which, at that time, provided: "Every manufacturer of motor vehicles or tires shall furnish notification of any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety, to the purchaser (where

known to the manufacturer) of such motor vehicle or motor vehicle equipment, within a reasonable time after such manufacturer has discovered such defect."

General Motors analogizes the furnishing of such notification to evidence of "subsequent repairs", which is classically inadmissible to prove the existence of a defect (see Richardson, Evidence [Prince, 10th ed], §§ 168, 221). That rule came into being when most personal injury cases were based upon the negligence of the defendant. General Motors contends that the admission into evidence of the letters unfairly penalizes manufacturers "who have come forward to announce the existence of a possible defect when it is found to exist." The analogy is inappropriate. Literally, of course, it does not apply because the letters were not an aftermath of the accident. The rule precluding the admission of evidence of subsequent repairs is that improvement of the condition of the injury-causing object indicates no more than a belief that it is *"capable of causing such an injury,* but indicates nothing more" (2 Wigmore, Evidence [3d ed], § 283 [4]), and that "[m]ere capacity of a place or thing to cause injury is not the fact that constitutes a liability * * * it must be a capacity which could have been known to an owner using reasonable diligence and foresight, and a capacity to injure persons taking reasonable care in its use." Wigmore then states:

"To be sure, it may be argued that, on the general theory of Relevancy * * * it would suffice for admissibility if merely the inference was a fairly possible one,—leaving it to the opponent to argue that it was the less probable one. Theoretically, it would be perhaps difficult to deny this. But in the present instance an argument of Policy has always been invoked to strengthen the case for exclusion. That argument is that the admission of such acts, even though theoretically not plainly improper, would be liable to over-emphasis by the jury, and that it would discourage all owners, even those who had genuinely been careful, from improving the place or thing that had caused the injury, because they would fear the evidential use of such acts to their disadvantage; and thus not only would careful owners refrain from improvements, but even careless ones, who might have deserved to have the evidence adduced against them, would by refraining from improvements subject innocent persons to the risk of the recurrence of the injury.

"Whatever then might be the strength of the objection to

such evidence from the point of view of Relevancy alone, the added considerations of Policy suffice to make clear the impropriety of resorting to it." (See, also, to the same effect, McCormick Evidence [2d ed], pp 666-669; Ann 170 ALR 7; 1 Frumer and Friedman, Products Liability, § 12.04.)

Even if the rule against admission of proof of subsequent repairs is not one which has outlived its usefulness and which should not now be discarded (see The Exclusionary Rule on Subsequent Repairs—A Rule in Need of Repair, 7 The Forum 1)[1], Wigmore's conclusion, and that of the other text writers in agreement with him, that regardless of the relevancy of the proffered proof it should be excluded because "the added considerations of Policy suffice to make clear the impropriety of resorting to it", should not be applied in products liability cases. The court, in *Sutkowski v Universal Marion Corp.* (5 Ill App 3d 313, 319), stated that "policy considerations are involved which shift the emphasis from the defendant manufacturer's conduct to the character of the product" and that therefore the rule excluding evidence of postoccurrence repairs in negligence cases should not be applied to products liability cases. Thus, while it may be sound to exclude evidence of postinjury remedial safety measures in negligence cases because the repairs reflect hindsight rather than foresight and might militate against the making of such repairs (see 2 Harper and James, Torts [1956 ed], p 981 Harper and James, Torts, Supp to Vol 2, pp 64-65 and *Smyth v Upjohn Co.,* 529 F2d 803), to extend the rule to cases of strict products liability would, without basis in reason, permit an arbitrary exclusionary rule to operate in the field of consumer protection. In such cases we are not dealing with *fault* or *negligence* or *culpability,* but, regardless of any of them, with a defect which existed in the product. The former deal with the defendant's conduct, the latter with the product (see 54 Cal L Rev 1550).

In enunciating the same view, the Supreme Court of California, in *Ault v International Harvester Co.* (13 Cal 3d 113, 120), said:

"When the context is transformed from a typical negligence

1. The writer of the article in The Forum, Professor Victor E. Schwartz, properly states that "Throughout the rather long and tortuous history of the rule excluding repairs, no court or writer has produced any empirical data showing that the rule has resulted in a single repair or that its absence would discourage repair activity" (7 The Forum 1, 6).

setting to the modern products liability field, however, the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 [a California procedural rule] does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

"This view has been advanced by others. It has been pointed out that not only is the policy of encouraging repairs and improvements of doubtful validity in an action for strict liability since it is in the economic self interest of a manufacturer to improve and repair defective products, but that the application of the rule would be contrary to the public policy of encouraging 'the distributor of mass-produced goods to market safer products.'"

In analyzing the usual public policy argument which has been used by the courts to preclude the admission of proof of subsequent repairs in negligence cases, and in demonstrating its inapplicability in a products liability context, we find the following cogent and convincing statement in an article entitled Products Liability and Evidence of Subsequent Repairs (1972 Duke LJ 837, 848-860):

"The assumption that the admission of evidence of subsequent repairs, discourages defendants from making required repairs may be erroneous. Manufacturers and distributors of mass-produced products may not be so callous to the safety of the consumer as the general exclusionary rule presumes. Furthermore, to the extent that admission of such evidence results in recovery by injured plaintiffs, it can be argued that evidence of subsequent repairs *encourages* future remedial action. A distributor of mass-produced goods may have thousands of goods on the market. If his products are defective, the distributor would probably face greater total liability by allow-

ing such defective products to remain on the market or by continuing to put more defective products on the market than he would by being adjudged liable in one particular case where evidence of subsequent repairs was introduced. Also, concern on the part of the distributors for consumer protection is promoted by consumer organizations, federal agencies, and mass media exposure of product defects. To some extent, the economic self-interest of product distributors requires that they repair and improve defective products to avoid adverse publicity which might result from future litigation. Since a prior jury finding of product defectiveness is admissible in a subsequent suit when the product causing the second injury is substantially similar to the first, distributors of defective products are under pressure to repair or alter their products to insulate themselves from a finding of defectiveness which may be used against them in subsequent litigation.

"In conclusion, excluding evidence of subsequent repairs to encourage future remedial action may preclude recovery under theories of products liability which are themselves designed to ensure safety in marketed products. Relevant evidence should not be excluded from a products liability case by an obsolete evidentiary rule when modern legal theories, accompanied by economic and political pressures, will achieve the desired policy goals" (emphasis in original).

The latest case in an appellate court dealing with the admissibility of manufacturers' recall letters is *Fields v Volkswagen of Amer.* (555 P2d 48 [Okla]):

That was an action for damages for injuries suffered by the plaintiff (Fields) when his 1971 Volkswagen overturned while he was attempting to negotiate a left-hand curve. He contended that the steering wheel locked while he was driving, making it impossible for him to keep the car on the road. The car was equipped with an ignition lock system that prevented the steering wheel from being turned while the ignition was off. Plaintiff claimed that the locking mechanism was defective when the vehicle left the factory and that the failure of that system was the actual and proximate cause of the accident.

There, as here, the plaintiff, prior to offering the recall letter in evidence, established the claimed defect by expert testimony. There, as here, the recall letter was then admitted. On appeal the court sustained the ruling and said (p 58): "The recall letter by itself does not make a prima facie case or shift the burden of proof. It does not prove that the defect existed

at the time of the accident. This must be proved independently. But if a defect contributing to or causing the accident is the defect that is the subject of the recall letter, *then the letter would be some evidence that the 'defect existed at the time the product left the manufacturer'* " (emphasis supplied).

Furthermore, as the court said in *Comstock v General Motors Corp.* (358 Mich 163, 176): "The duty to warn of known danger inherent in a product, or in its contemplated use, has long been a part of the manufacturer's liability doctrine."

In the light of the foregoing, and since the plaintiff is required to prove that the defect existed not only at the time of the accident but also at the time when the product left the hands of the manufacturer (see Prosser, Torts [4th ed], pp 671-672), we believe that the relevancy of the recall letters outweighs any possible prejudice in their receipt; a jury is entitled to know that the existence of the defect in a particular model of vehicle was likely and that such likelihood was greater as to such model than it was as to other models (cf. *Sutkowski v Universal Marion Corp.,* 5 Ill App 3d 313, *supra; Glynn Plymouth v Davis,* 120 Ga App 475, affd 226 Ga 221; *Landry v Adam,* 282 So 2d 590 [La App])[2].

As an additional answer to General Motors' public policy argument (that the admission of such recall letters would discourage manufacturers from announcing a possible defect), it is merely necessary to point out that such announcement was not a voluntary act, but one *mandated* by Federal statute (see Motor Vehicle Safety Act of 1966).

True it is that some prejudice is inevitable in such a case, but it can, and should, be minimized by the court's caveat, at the time of its receipt in evidence, and when charging the jury, that such letters do not establish that the defect was present in the particular vehicle. Thus, to sustain a verdict for a plaintiff based upon an existing defect, such letters, standing alone, would be insufficient. Here, however, we have the testimony of plaintiff's experts (albeit contradicted by that of

---

2. The *Landry* case, however, held that (p 597) "for reasons of public policy, evidence of or reference to the recall program itself is an improper method of proving similar defects." As our opinion shows, we do not agree with that conclusion and, so far as our research discloses, there has been no similar holding by any other appellate court (but see *Vockie v General Motors Corp.,* 66 FRD 57 in which the United States Court for the Eastern District of Pennsylvania agreed with that statement although it felt that the *Landry* court "confuses the issue of relevance with weighing of relevance against possible prejudice and confusion" (at p 61, n 5).

General Motors' expert witnesses), which was not unbelievable, and which justified the jury's conclusion that the defect existed prior to the accident and that it caused the accident. The statements contained in the letters could therefore properly be utilized by the jury as confirmation of that testimony.

There is an additional factor to be considered. We may take judicial notice that recall letters by automobile manufacturers have by now been sent out by the millions. The failure to mention the letters might well cause jurors to believe that no such letters were issued and that the claimed defect was a solitary one and did not in fact exist. In such case the prejudice to the injured plaintiff could not be minimized because it would relate to undisclosed matters.

As indicated, the admission of such exhibits must be handled with such circumspection that it is made clear to the jury that its consideration of them is not the end of the matter, but, rather, a circumstance to be considered along with the rest of the evidence in the case. Here there was no such circumspection. On the contrary, the trial court charged the jury that "[i]f you find from the fact that General Motors sent these letters *that it thereby admitted that the engine mounts in the Manglass vehicle were defective,* you may consider these letters as evidence * * * that *this vehicle* was defective" (emphasis supplied).

Obviously, the letters were not an admission that the *vehicle involved in this case was defective.* Further, the charge tended to eliminate the issue of proximate cause. Most importantly, it maximized, rather than minimized, the implicit prejudice of the letters. As we have noted, the letters were admissible *despite* their prejudice, but the trial court should have balanced the scales and should not have unduly added to the one side which was already weighted. This basic error alone requires a new trial as to defendant General Motors.

Coming now to the verdict against the Manglasses, we find that General Motors' explanation for the accident was that Gary Manglass had made a left turn at 50 or 60 miles per hour, causing him to lose control of his vehicle. To make this contention believable it sought to show that he had been drinking shortly before the accident. In connection with the cross-examination of his father, there was introduced into evidence, over objection, a record from the hospital emergency room to the effect that the father had stated that his son "had had a few beers". The record shows that there was no smell of

alcohol on Gary's breath. The statement in the hospital record had been made in response to an inquiry, which apparently was itself made to determine whether, in addition to the trauma, there was another possible reason for Gary's incoherence. The fact was, however, that the father had not seen his son since early on the morning of the accident. In addition, one Wilfred Lewis (a witness for the Manglasses), who testified that he had been with Gary for several hours prior to the accident, was questioned as to whether Gary had been drinking during that period and he answered that he had not been drinking. On cross-examination he was asked, over objection, whether in the *past* he had seen Gary Manglass drink beer, and he answered "Yes".

It seems clear that the verdict against the Manglasses (as finally rendered)[3] was, or at the very least could have been, tainted by that highly prejudicial testimony and by the improper acceptance into evidence of the "beer" portion of the hospital record. Evidence of intoxication or intemperance on another occasion is not admissible to show that such was the condition at the time in issue (see *Warner v New York Cent. R. R. Co.,* 44 NY 465; Richardson, Evidence [Prince, 10th ed],

---

3. After the liability phase of the trial, the jury returned a verdict in the following language:

"We the jury find a verdict in favor of Barry and McElroy against Manglass for negligence in cause of action.

"In favor of Manglass against General Motors for breach of duty to manufacture a nondefective automobile.

"In favor of Barry and McElroy against General Motors for breach of duty to manufacture a nondefective automobile."

The trial court then told the jury that there was "some ambiguity" in its verdict and he thereupon gave them two written questions to answer:

" 'Was Gary Manglass negligent in the operation of his motor vehicle? Answer: Agree, Disagree.'

"Paragraph two: 'If your answer to question one is yes, was his negligence a proximate cause of this accident? Answer: Yes or no.' "

The jury finally—after being rebuffed by the trial court in its request for clarification of the questions and being told that it must answer them "and return it to me. Its that simple"—answered the questions in the following manner:

"COURT CLERK" Question number one, 'Was Gary Manglass negligent in the operation of his motor vehicle? Answer: Yes.' * * *

"Question number two, 'If your answer to question number one is "Yes", was his negligence the proximate cause of this accident? Answer: Yes.' "

The trial court thereupon dismissed the complaint of the Manglasses as plaintiffs. Thereafter, as noted, the jury, on direction of the court "to determine the relative degree of fault of each defendant and determine as between them what part of the total verdict should be the responsibility of each defendant", fixed the relative percentages of fault at 65% for Manglass and 35% for General Motors.

§ 186). Its admission tended to indicate to the jury that the alleged beer drinking was a proper issue, when in fact it was no issue at all.

Those errors require a new trial as to the Manglasses, both as defendants and as plaintiffs in their own action against General Motors.

Since there is no claim of excessiveness in the award of damages, the new trial should be limited to the issue of liability and the apportionment thereof, if any, to be made between the defendants (see *Dole v Dow Chem. Co.,* 30 NY2d 143). The verdicts as to damages are to be held in abeyance pending the new trial (see *La Rocco v Penn Cent. Transp. Co.,* 29 NY2d 666; *Romanelli v Gordon,* 39 AD2d 594). If the jury, on the new trial of the liability issue, should absolve the Manglasses of negligence and find in their favor as against General Motors, the trial court should then proceed to an assessment of their damages as against General Motors.

COHALAN, Acting P. J., MARGETT, DAMIANI and TITONE, JJ., concur.

Three judgments of the Supreme Court, Rockland County, entered August 25, 1975, July 10, 1975 and *nunc pro tunc* as of June 10, 1975, respectively, reversed, on the law, and new trial granted as between all parties in all actions, on the issues of liability and apportionment only, with costs to abide the event. The facts have not been considered. The verdict as to damages is held in abeyance pending the new trial in accordance with the opinion of Mr. Justice SHAPIRO herein. If the jury, on the new trial of the liability issues, should absolve the Manglasses of negligence and find in their favor as against General Motors, the trial court is then to proceed to an assessment of their damages as against General Motors.

