44619.   GLYNN PLYMOUTH, INC. v. DAVIS.
44620.   CHRYSLER MOTORS CORPORATION v. DAVIS.

Argued July 8, 1969—Decided September 2, 1969—Rehearing denied September 23 and October 16, 1969—

*Bouhan, Williams & Levy, Walter C. Hartridge, III, Bennet, Gilbert, Gilbert & Whittle, Wallace E. Harrell,* for appellants.

*Alaimo & Taylor, James A. Bishop, Anthony A. Alaimo, Neely, Freeman & Hawkins, Joe C. Freeman,* for appellees.

EBERHARDT, Judge. The primary question as to whether the evidence with all reasonable deductions and inferences therefrom demanded a verdict for the defendants is common to both of them in certain respects and will be considered first, along with the question of the probative value of certain critical testimony. We will then deal with the question of whether Glynn Plymouth, the dealer, could be held liable under the evidence for failure to inspect, discover, and repair the alleged manufacturing defects.

1. *As to Both Defendants.* The critical issues here are whether there was sufficient evidence to show that there were defects in the automobile as contended and, if so, whether they were the causative factor of the occurrence giving rise to this lawsuit.

With regard to the claimed defects there is no direct, positive testimony either that the suspension system was improperly attached or that the brake drums were out of round. In the latter part of the summer or early fall of 1966, Mrs. Davis turned the car over to her counsel. He returned it to her during the early fall and she sold it in Jacksonville, Florida, prior to bringing this suit.

Relative to the suspension system, plaintiff introduced a form recall letter dated May 18, 1966, which the manufacturer sent out to all people who had purchased from its dealers a 1966 Plymouth Belvedere stating that a small percentage of these cars had been found to have nuts on a part of the system that were not properly tightened, and asked that the car be returned to the dealer for inspection and, if needed, correction. The letter was addressed to Mr. Davis, indicating that he had purchased a vehicle with a stated serial number. Mailed after his death, the letter was delivered to Mrs. Davis. There was testimony from plaintiff's expert that if the suspension system

on a car were loose it might result in a loss of control by the driver.

Defendants contend that this letter was improperly admitted over their objection that this kind of evidence is impermissible under the "repair doctrine" as exemplified in *Georgia S. & F. R. Co. v. Cartledge*, 116 Ga. 164 (42 SE 405, 59 LRA 118) and *Atlantic C. L. R. Co. v. Sellars*, 89 Ga. App. 293, 296 (79 SE2d 35), and because the admission of this type of evidence would tend to discourage manufacturers from making every effort to safeguard the public from injury which might result from some inadvertent error later discovered.

Assuming, but not deciding, that this objection was not a valid one and that the letter was properly admitted, there is nevertheless no proof of any defect in the suspension system of the Davis car upon which a verdict could stand. All evidence as to that is wholly circumstantial in nature. It cannot be assumed that this vehicle was one of the "small percentage" of the number produced and sold that went out with the defect; there must be proof of it. Nor did the expert's testimony that if such a condition did exist it could result in a loss of control by the driver suffice to show its existence when plaintiff was claiming the existence of another defect which the expert also testified could have a like result, and when the investigative patrol officers testified to a state of facts indicating the likelihood of another cause of the car going into the ditch bank, viz., that the car was being driven at a relatively high speed when Mr. Davis saw the train at the crossing and he applied the brakes as in emergency, laying down straight skid marks for some 273 feet and at a point near the crossing when the car had not been brought to a stop, turned into the ditch and ditch bank as a better choice than heading on into the passing train. See *Georgia R. &c. Co. v. Harris*, 1 Ga. App. 714 (1) (57 SE 1076).

Moreover, there was positive, unimpeached testimony from the mechanic who made repairs to the front end damage after the accident that he found the suspension system to be in good order. He removed the upper control arm, a part of the suspension system, which was bent in the accident, and replaced it,

finding it properly attached by two bolts, and that the nuts were tight. He road-tested the car and found no evidence of any malfunction. This contention was thus disproven. *Frazier v. Georgia R. & Bkg. Co.,* 108 Ga. 807 (33 SE 996); *Lankford v. Holton,* 187 Ga. 94, 102 (200 SE 243); *Myers v. Phillips,* 197 Ga. 536 (4) (29 SE2d 700); *Emory University v. Bliss,* 35 Ga. App. 752 (134 SE 637); *Slaton v. Atlanta Gas-Light Co.,* 62 Ga. App. 42 (1) (7 SE2d 769).

Concluding that this charge of negligence was not established and that a verdict on the basis of it could not stand, we now turn to the evidence adduced relative to the defect alleged to have been in the brakes and the role it played in this occurrence.

Plaintiff offered the testimony of William Walker and Leo Hopkins as experts. Walker, who had been the general manager for a Chrysler-Dodge dealer for approximately four years, testified that by training and experience he was familiar with the 1966 Plymouth Belvederes and other Chrysler products, including the Dodge which was quite similar to the Plymouth. He stated that he was familiar with the braking system of the 1966 Plymouth Belvederes; that Chrysler had made an effort to increase the size of the brake drums on its products in order to improve the braking systems; that in 1966 the Dodge Coronets and the Plymouth Belvederes gave a lot of trouble with their braking systems; and that Chrysler had paid his dealership hundreds of dollars to correct many of these brake drums that were out of round. Walker described for the jury what an out-of-round brake drum looked like and the surging sensation it causes, and he then testified that this condition would cause a tremendous pounding sensation in a hard stop, resulting in loss of control of the automobile. Walker was posed a hypothetical question, based upon the situation where a man is driving a 1966 Plymouth Belvedere at a speed of 60 m.p.h. and applies his brakes hard as in an emergency, whereupon the automobile begins to chatter or shake and tends to go out of control veering from one side of the highway to the other, ultimately ending in a ditch. In response to the question of what would have caused the automobile to shake and to go out of control in these circumstances, it was Walker's opinion that the

driver had problems with his brake drums being out of round. He further testified that from his experience this was a problem which was inherent in the type of brake used in the 1966 Plymouth Belvederes.

Leo Hopkins, plaintiff's other expert, testified that he was presently the service manager with the Plymouth Mart in Brunswick; that he had been a service representative for Chrysler from May, 1966, to August, 1967, and had called on dealers for technical problems and service developments and had processed warranty claims for all Chrysler products; that he was familiar with the 1966 Plymouth Belvederes, and that he had processed claims as to brake drums being out of round on this series automobile; that when this condition existed and the brake was applied, a vibration and shake condition would be felt on the pedal and in the front end of the car; and that he had driven automobiles at 60 m.p.h. and noticed the vibration when he stepped on the brake, and that if the brakes were applied in an emergency fashion the driver could possibly lose control of the automobile. In response to the same hypothetical question asked Walker, Hopkins stated that it was very possible the driver would feel the vibration and a shudder, and it would probably be due to the drum being hot and driving on the road that could cause a vibration and loss of control of the automobile. This, he stated, would be due to the brake drum being out of round. Hopkins also identified a Chrysler shop manual relating to the 1966 Plymouths, including the Belvederes, which was admitted into evidence. Testifying from this manual, Hopkins stated that the condition of pulsating pedal and brake chatter would have as a possible cause bent or out-of-round brake drums.

As to the automobile in question, Mrs. Davis testified that prior to the collision "One time a slight, the brake pedal shook under my foot." After the collision the automobile was partially repaired and Mrs. Davis continued to drive it in this condition. She stated that the automobile "didn't handle right" and that "it would shake, sometimes the brake pedal shook under my foot, I could feel it quiver, and it just didn't seem to handle like it should handle." She was asked as to the

similarity between the way the car handled before and after the accident, and she replied: "It seemed to me that the brake pedal was—it sorta momentarily went out from under control or at least I felt that I didn't have control." In amplification of the occasion after the collision when the pedal shook, she later testified on plaintiff's rebuttal that as she rounded a bend in the road she "applied the brakes and the wheel, brake pedal, everything, the entire car started shaking and the next thing I knew we were completely off the road on the left side."

While it does not necessarily follow that because some of the 1966 Plymouth Belvederes had out-of-round brake drums, this one did, yet from this evidence we conclude that a jury could reasonably find that the 1966 Plymouth Belvederes had a common, inherent manufacturing defect in the braking systems by virtue of out-of-round brake drums and that this condition existed in the automobile in question. We find no evidence or suggestion in the record that this condition was corrected prior to the collision, and we think the jury could have concluded that it existed at the time of the collision.

It is insisted that this evidence is wholly circumstantial in nature, as indeed it is, for there is no evidence directly showing that the brake drums of this particular Plymouth were out of round; nothing indeed, save the further circumstantial evidence that when the brakes were applied as in emergency the car would shake and tend to go off the road and that this could have been caused by the condition of the brake drums. See *Frazier v. Georgia R. & Bkg. Co.*, 108 Ga. 807, supra; *Emory University v. Bliss*, 35 Ga. App. 752, supra; *Slaton v. Atlanta Gas-Light Co.*, 62 Ga. App. 42 (1), supra. But there was no direct testimony that the condition did not exist, unless it be the testimony of Mr. Pickren, who testified that he road-tested the car after repairing the front end damage and in so doing observed nothing to indicate that there was anything wrong with the brakes. However, this matter was not called to his attention and he had not examined the brake drums; his testimony was wholly negative in character.

It is urged, too, that since Mrs. Davis was in possession of the automobile and after the accident delivered it to her attorney,

presumably for having the suspension system, brakes, etc., examined and tested, and that she or he kept it until a short time before these actions were instituted and produced no evidence upon the trial as to the examination or tests made or the results thereof, it must be presumed that they were or would have been negative, and that this is particularly true since she disposed of the car in another state. making it unavailable for examination or tests by the defendants. *Code* § 38-119. "Spoliation of evidence raises a presumption against the spoliator." *Greer v. Andrew,* 138 Ga. 663 (3) (75 SE 1050). See *Bennett v. Associated Food Stores, Inc.,* 118 Ga. App. 711, 716 (165 SE2d 581). The presumption raised by the withholding, suppression or spoliation of evidence is however, one of fact and not one of law. It may be rebutted and it is generally for the jury to say whether that has been done. *Brothers v. Horne,* 140 Ga. 617 (3) (79 SE 468).

Consequently, while the evidence was weak, particularly in the light of the presumption, we conclude that it was for the jury to resolve the question of whether there was an out-of-round condition in the brake drums.

A more difficult question arises as to the causal relation between the defective braking system and the collision. Since Davis was the only witness to the collision and died prior to trial, the only evidence as to what actually occurred consists of statements he made to others and the observations and interpretations made by the investigating officers upon their inspection of the scene. In describing the skid marks left by Mr. Davis' automobile, Officer Millar testified that they were a continuous, solid set of skid marks measuring 273 feet from the point at which the wheels were locked to the resting place; that they were continuous skid marks and not broken or bumpy with skip marks as if a car had been bouncing down the road (as might be the case with out-of-round brake drums) and that there was no evidence of one wheel being at a stop with all other wheels moving or the car spinning or anything of that sort. It was Officer Millar's opinion from looking at the skid marks and the travel of the car as it came back on the roadway after it had been off to the right, that when Davis jerked the

car back on to the highway this naturally caused him to lose control of it and it veered off to the left and went into the ditch. Officer Harris gave substantially the same testimony in regard to the skid marks.

Were this the only testimony which could be considered in relation to the occurrence itself, we would have to conclude that there was no sufficient evidence of a causal connection between the defective brakes and the collision. However, testimony was admitted *without objection* as to what Davis told others in regard to the occurrence. Mrs. Davis testified that he told her, "Well, he was coming home, and the blinker lights on the crossing started to blink, and he applied his brakes and the car started to shake and chatter and go just completely out of control. And from the time he touched the brakes he had no control over the car." On the other hand, Officer Harris testified that he had a conversation with Davis at the hospital on the date of the collision, and Davis "said he was approaching the railroad intersection, the red signal lights came on, he figured he was too close to make it across the tracks so he applied his brakes. The wheels locked and his vehicle skidded into the ditch on the left-hand side of the road." On his report Officer Harris gave the following description, which was apparently based in part at least on what Davis had told him: "Railroad signal lights came on indicating the train was approaching. Driver of vehicle applied his brakes and his wheels locked. He skidded 273 feet to where he went into railroad ditch to avoid striking the train. Car went in ditch on left side of road." Officer Harris further testified that during the time he talked with Davis, he made no complaint or statement with respect to any malfunction of any kind in the vehicle he was driving. In rebuttal, Mrs. Davis testified that she was present when Mr. Davis talked to Officer Harris, and that Davis gave him substantially the same version that she had previously testified to. Another witness, Richard Miller, testified that he helped put Davis in the ambulance at the scene and that Davis told him "he really didn't know what happened, he applied the brakes and the car started jumping down the road was his term."

We are not called upon in this appeal to determine the *ad-*

*missibility* of this or any other evidence. Rather the controversy centers around whether the testimony of Mrs. Davis, obviously hearsay, falls within the necessity exception so as to have probative value. Since her testimony would be sufficient to carry the case to the jury on the question of proximate cause, we therefore confine our deliberations to the debated question of whether the testimony as to what Davis told her falls within the necessity exception.

We held in *Moore v. Atlanta Transit System,* 105 Ga. App. 70 (2), supra, that "The declarations of a decedent to whomsoever made are admissible in evidence if there are no other witnesses to the alleged occurrence, it being for the jury, under appropriate instructions, to determine their weight and credibility." We thus recognized the rule of necessity as an exception to the hearsay rule, and we followed that holding in *Commissioners &c. of Fulton County v. Dowis,* 107 Ga. App. 647 (1) (131 SE2d 144), and *Horton v. Nichols,* 117 Ga. App. 748, 750 (162 SE2d 208). But in reviewing the authorities in *Moore* we recognized that the basis for the rule is the necessity of allowing the declarations of a decedent where they are the only method of proof available. Thus in commenting upon *Poole v. East Tenn. &c. R. Co.,* 92 Ga. 337 (17 SE 267) on motion for rehearing, while recognizing that that case did not deal with the rule of necessity, we stated: "Moreover, in *Poole* the case turned upon the physical condition of a railroad crossing, a matter about which there should have been ample other evidence available." *Moore v. Atlanta Transit System,* 105 Ga. App. 70, 85.

Hence, in the case at bar defendants now urge that there was no necessity for the admission of the statement of Mr. Davis to his wife since she had the car in her possession and could have produced proof of its physical condition independently of his declarations. If the matter in issue at this point were solely as to the physical condition of the car, this point would be well taken. However, the crucial matter here is what happened to the automobile when Mr. Davis applied his brakes, a possible causal connection if the brakes were out of round; and the only available evidence as to whether there was brake chatter, vibra-

tions, etc., resulting in loss of control at this point consists of his declarations.

Since the testimony as to what Mr. Davis, the deceased husband, said about the actions of the car was admitted without objection, the question as to whether it qualified for admission under the necessity rule or whether other and better evidence of the condition of the car survived him which might have been presented was not raised in the trial court, cannot be raised in this court, and we make no ruling on that. The evidence was apparently tendered and admitted under the rule of necessity as an exception to the hearsay rule, and in that light we conclude that it had some probative value. This being so, there was sufficient evidence to go to the jury on the matter of whether a defective brake system proximately caused the collision.

We therefore hold that a verdict was not demanded for the defendants on the issues discussed in this division of the opinion.

2. *As to Glynn Plymouth.* If the jury should conclude that the brake drums were not shown to be out of round, or that if they were this was not the cause of Mr. Davis' injuries, the matter is at an end and a verdict should be returned for both defendants. However, if it finds that this defect did exist and that it was the cause of the injuries, a verdict would be authorized against Chrysler as the manufacturer of the vehicle, but in order to return a verdict against Glynn Plymouth, the dealer, it would be necessary to determine whether the defect was one which reasonably might have been discovered in the making of the inspections required of it, and, if so, whether it had been negligent in the making of the inspection or in failing to inspect.

(a) "It is the general rule that a vendor or dealer who is not the manufacturer is under no obligation to test an article, purchased and sold by him, for the purpose of discovering latent or concealed defects, but that when he purchases and sells, in the usual course of trade, an article in common and general use, without knowledge of its dangerous quality and with nothing tending reasonably to call his attention thereto, he is not negligent in failing to exercise care to determine whether it is dangerous or not." *King Hardware Co. v. Ennis,* 39 Ga. App. 355 (1) (147 SE 119). This rule has been applied in auto-

mobile cases. *Washburn Storage Co. v. General Motors Corp.,* 90 Ga. App. 380 (2) (83 SE2d 26); *Griffith v. Chevrolet Motor Div., GMC,* 105 Ga. App. 588 (2a) (125 SE2d 525). As we said in *Griffith,* however, a dealer is not relieved of *all* duty of inspection under *all* circumstances. See generally Prosser, Torts, p. 648, § 95 (3d Ed., 1964); 2 Harper & James, Torts, p. 1597, § 28.29 (1956); Restatement 2d, Torts Vol. 2, p. 345, § 402 (1965).

We have such a case before us. Subsequent to *Washburn* and *Griffith,* the General Assembly · passed what is known as the Motor Vehicle Inspection Law. *Code Ann.* § 68-1726.6 provides: "After July 1, 1965, no dealer engaged in the business of selling new or used motor vehicles shall sell at retail any vehicle required to be inspected by this Article [§§ 68-1723 through 68-1726.6] unless the dealer shall have said vehicle inspected in accordance with the provisions of this Article and a current official inspection certificate is obtained for said motor vehicle and placed thereon." *Code Ann.* § 68-1726 provides: "(a) The director shall once each year require that every motor vehicle . . . registered in this State be inspected and that an official certificate of inspection and approval be obtained for each such vehicle. . . Such inspections shall be made and such certificates obtained with respect to the following equipment of every such vehicle: (1) Brakes. The performance ability of brakes shall meet those minimum requirements prescribed by subsection (b) of section 68-1715." *Code Ann.* § 68-1715(b) sets forth the tests and requirements in regard to the performance ability of brakes.

While there was testimony indicating that an out-of-round brake drum could be detected only by measuring it with a gauge after a complaint or road test indicated some difficulty, and no complaint had been made to Glynn Plymouth by the Davises prior to the collision, Walker testified that the State requires a safety inspection sticker to be affixed to the windshield of a car sold by a dealer at retail, and that an inspection of the stopping distance on brakes was part of the inspection procedure (*Code Ann.* § 68-1715 (b)). The question was asked: "Would such a test necessarily indicate whether or not

the brake drums were out of round?" And Walker answered: "If this test was run to specifications, it would, yes, sir." He further testified that the inspection is not made until shortly before the car is sold and delivered.

While there is a presumption that all persons perform all duties required of them by law (*Clements v. Hollingsworth,* 202 Ga. 684 (44 SE2d 381); *Beadles v. Bowen,* 106 Ga. App. 34 (126 SE2d 254)), and it is not to be presumed that an illegal or negligent act has been committed (*Wheeler v. Wheeler,* 82 Ga. App. 831, 834 (62 SE2d 579)), these presumptions may be overcome when there is some evidence which would authorize the jury to so find. *Bartow Guano Co. v. Adair,* 29 Ga. App. 644 (3) (116 SE 342). In the record is to be found a photograph of the car made immediately after the collision showing an inspection sticker on the windshield. Since the car was less than a year old it may be fairly concluded that the sticker was current and not out of date. However, under Mr. Walker's testimony we think the jury reasonably could find either that Glynn Plymouth failed in making a proper inspection and thus did not find the condition in the brake drums, or if the condition was found, failed in making the necessary correction. Further, there appears no testimony from Glynn Plymouth that the inspection was properly made and that it revealed the presence of no defect. See *Frazier v. Georgia R. & Bkg. Co.,* 108 Ga. 807, supra. Hence, it cannot rely on *Washburn* and *Griffith,* and could be held for failure to make a proper inspection and the necessary correction.

(b) Glynn Plymouth's remaining contention is that recovery is barred by the fellow-servant doctrine. Suffice it to say that at the time of sale of the automobile Davis was not its employee but was an ordinary purchaser of an automobile.

*Judgments affirmed. Bell, P. J., and Deen, J., concur.*