151 N.J. Super. 422 (1977)
376 A.2d 1317
ROBERT MANIERI AND PAULINE MANIERI, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
VOLKSWAGENWERK A.G., A CORPORATION, AND VOLKSWAGEN OF AMERICA, INC., DEFENDANTS-RESPONDENTS, AND WORLD WIDE DISTRIBUTORS, INC., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1977.
Decided July 12, 1977.
*424 Before Judges LORA, CRANE and MICHELS.
Mr. Thomas G. Aljian argued the cause for appellants.
*425 Mr. John T. Dolan argued the cause for respondents (Messrs. Crummy, Del Deo, Dolan and Purcell, attorneys; Messrs. Herzfeld and Rubin, of the New York bar, of counsel).
The opinion of the court was delivered by MICHELS, J.A.D.
Plaintiffs Robert Manieri and Pauline Manieri appeal from a judgment entered in favor of defendants Volkswagenwerk A.G. and Volkswagen of America, Inc. as the result of a jury verdict of no cause for action, and from a denial of their motion for a new trial.
Plaintiff Robert Manieri was the general sales manager of a Volkswagen dealership located in Washington, New Jersey. While driving a new 1969 Volkswagen en route to a Volkswagen dealer's convention in South Fallsburg, New York, his car left the highway, went down an incline and struck a tree, causing serious personal injury. During plaintiff's journey rain and snow were falling, and there were accumulations of slush on the road. These weather and road conditions continued throughout the trip and were extant at the time of the accident. When plaintiff had driven several miles from the dealership, he observed that the defroster was not working properly and that the interior of the windshield was fogging up. He was therefore required to use a utility rag to wipe the windshield clean of fog. He also opened and closed his left window and vent in an effort to stop the fogging while not letting rain and snow into the automobile. Both windshield wipers apparently operated properly until a tractor-trailer truck going in the opposite direction passed, splashing slush across the windshield and into the opened window, hitting plaintiff in the face. As a result of this, the wiper on the driver's side stopped working for about ten seconds. The right wiper continued to operate. The last thing plaintiff remembers is that he leaned over to clear the fog from the interior of the windshield on the passenger's side. The car went off the road and the accident giving rise to this suit occurred.
*426 Plaintiff instituted suit against defendants Volkswagenwerk A.G., Volkswagen of America, Inc., and World Wide Distributors, Inc., to recover for the personal injuries he sustained in the accident.[1] His wife sued per quod. He contended that defendants, as manufacturers and distributors of the 1969 Volkswagen, were negligent in the design, manufacture and assembly of the vehicle and breached expressed and implied warranties that the Volkswagen, as well as the component parts thereof, were fit for their intended use. He also alleged that the defendants were liable on the theory of strict liability in tort. Specifically, plaintiff charged that the vehicle lacked crashworthiness, that the seat belts were not properly anchored, and that the windshield wiper and defroster systems were defective, resulting in his inability to observe the highway. The allegations of the lack of crashworthiness of the vehicle and the failure to anchor the seat belts properly were voluntarily withdrawn by plaintiff during the course of discovery, and at pretrial conference plaintiff abandoned the claim that the defroster system was defective. Plaintiff claimed at trial that the accident was caused by a defective windshield wiper. He charged that the windshield wiper assembly was defectively designed because "the windshield wiper arm depended solely on a set screw being properly torqued to the windshield wiper shaft," and that the set screw had not been properly torqued, as a result of which the windshield wiper failed to operate when subjected to the stress and force of the heavy slush on the windshield.
The windshield wiper system utilized in the 1969 Volkswagen involved consisted in part of a circular transmission shaft which protruded from the front of the vehicle to which was attached a wiper arm and blade. The wiper arm and blade were attached to the shaft by means of a bracket and *427 set screw. The set screw had to be torqued or tightened to the proper degree in order to lock the arm to the shaft. This was accomplished generally by use of a wrench as distinguished from a screw driver. If the set screw was not torqued properly, there was a distinct possibility of slippage under stress. Thus, it was possible for the shaft to move but the wiper arm and blade to fall or sag under the stress of heavy snow, slush or other debris on the windshield. The 1969 Volkswagen here involved was manufactured in Germany, but the windshield wiper assembly was installed at the Washington dealership. The president of that dealership testified that his mechanics, who were specially trained to work on Volkswagens, used socket-rachet type wrenches, not screw drivers, to torque the set screws on the wiper assemblies.
Plaintiff's expert, an automobile mechanic, testified that the design of the method of attachment of the windshield wiper arm to the windshield wiper shaft was defective because it was dependent upon the set screw being torqued to the proper degree and, if improperly torqued, slippage of the wiper arm could occur under stress. He pointed out that American-manufactured automobiles utilized a spline-type method of locking the wiper arm to the shaft. This design employed a circular shaft with teeth or grooves around it to reduce the chances of slippage. He was of the opinion, based upon the hypothetical question propounded to him, that the windshield wiper arm on the 1969 Volkswagen driven by plaintiff was not installed correctly and that the set screw was not tightened to the proper degree, as a result of which the wiper failed under the weight of the slush on the windshield.
Defendant's proofs, on the other hand, tended to show that the windshield wiper assembly was not defectively designed and that the wiper arm on plaintiff's 1969 Volkswagen was not incorrectly installed. One of defendants' experts, a safety test engineer at the Technical Development Center of Volkswagen in Germany, testified that he was of the opinion that since plaintiff had observed the right wiper operating, the *428 left wiper was also operating because both wipers were driven by a single motor. He also testified that if slippage were to occur as theorized by plaintiff, it would have occurred sooner, and plaintiff would have observed the area of the windshield being cleaned by the wiper gradually narrow down.
At the conclusion of the lengthy trial the jury unanimously returned a verdict of no cause for action in favor of defendants. Plaintiffs' motion for a new trial was denied, and this appeal followed.
Plaintiffs seek a reversal of the judgment and a new trial, contending solely that the trial judge erred in excluding evidence of defendants' recall campaign relating to the failure of windshield wipers on certain Volkswagens. Plaintiff offered to introduce evidence to show that the 1969 Volkswagen he was operating was one of 3,700,000 Volkswagens manufactured from 1949 through 1969 which were subject to a safety defect recall campaign as the result of a Consumer Bulletin issued by the National Highway Traffic Safety Administration warning Volkswagen owners that windshield wiper failures could occur on certain Volkswagen models, and that in the Fall of 1974 defendants issued recall letters to Volkswagen owners and service letters to Volkswagen dealers informing both of them of this problem, urging the owners to bring their cars to an authorized dealer to have the wiper arm set screws checked to assure that they were correctly tightened, and suggesting to the dealers that they advise their customers thereof. The recall letter issued to the customers stated:
We have received reports that windshield wiper performance has been impaired on some 1969 and older Volkswagens because the set screws holding wiper arms to their driving shafts have become loose. This loosening occurs only in instances where the set screw was improperly torqued, and the vehicle is operated during periods of freezing or heavy rain or snow when the wiper is subject to unusual strain. If the arm becomes loose, wiper operation will be erratic and may cease entirely.
With winter months approaching it is important that your windshield wipers are in good condition and perform properly. We urge *429 you to bring your car to an authorized Volkswagen dealer to have the wiper arm set screws checked to assure that they are correctly tightened so they will not allow the wiper arms to slip on their driving shafts. If your wiper arms cannot be properly tightened, due to damage or wear, the dealer has replacement parts available to repair the system.
The service letter issued to the dealers stated in pertinent part:
The National Highway Traffic Safety Administration has issued a Consumer Bulletin warning Volkswagen owners that windshield wiper failures can occur on certain Volkswagen models.
In the interest of traffic safety, Volkswagen Of America will notify known registered owners and suggest that they have their windshield wipers checked for proper performance. A copy of Volkswagen Of America's letter to known owners is attached for your information.
In addition to Volkswagen Of America's customer notification, we also suggest that you advise customers coming into your dealership for service that the windshield wiper performance could be impaired on VW's manufactured between 1949 and 1969. This occurs when the set screw holding the wiper arm to its driving shaft has become loose during normal operation because it was not properly torqued at the time of installation, or as a result of being lifted repeatedly by service station attendants. During heavy rain or snow the wiper arm could become inoperative resulting in impairment of vision.
Defendants argue that the trial judge properly excluded the recall evidence since it was not relevant to the issues in the case and plaintiff had not demonstrated by "significant independent and believable proof that the specific defect in the recall existed in the accident vehicle."
"Relevant evidence" is "evidence having any tendency in reason to prove any material fact." Evid. R. 1(2). "[T]he relevancy of testimony must be tested by its probative value with respect to the points at issue." Simon v. Graham Bakery, 17 N.J. 525, 530 (1955); De Cicco v. Marlou Holding Co., 137 N.J.L. 186, 189 (E. & A. 1948). See also, Hagopian v. Fuchs, 66 N.J. Super. 374, 384 (App. Div. 1961). As so aptly explained in the commentary to the rule:
The true test of relevance is the logical connection of the proffered evidence to a fact in issue. The inquiry is whether the proposition *430 or thing sought to be established is more logical with the evidence than without it. Thus, under Rule 1(2) evidence is deemed relevant if it has any tendency in reason to prove any material fact. However, even relevant evidence at times may be excluded. See Rule 4. [New Jersey Rules of Evidence (1972 ed.), Comment § 1(2)-2, at 2]
Plaintiff claimed that the accident and his injuries were proximately caused by a defective windshield wiper and sought to recover damages under theories of breach of an implied warranty of fitness for use and strict liability in tort. Regardless of how plaintiff's cause of action may be characterized, it is now to be included within the doctrine of strict liability in tort. Our Supreme Court has held "that when the gravamen of a consumer suit against a manufacturer or retailer for consequential personal injuries and property damage is a defect in the article, the action will be considered as one founded on strict liability in tort, whether the cause of action is pleaded in express or implied warranty, in strict liability, or in any combination of these theories." Realmuto v. Straub Motors, 65 N.J. 336, 345 (1974). See also, Heavner v. Uniroyal, Inc., 63 N.J. 130, 156 (1973).
* * * Under this doctrine manufacturers and retailers are liable for damages if the product left their hands in a defective condition proximately causing the mishap. Thus, a plaintiff in a strict liability case must establish that the product was defective, that the defect arose while in the control of the defendant, and that the plaintiff suffered injury thereby. See Jakubowski v. Minnesota Mining & Manufacturing, 42 N.J. 177 (1964); Newmark v. Gimbel's Incorporated, 54 N.J. 585 (1969); Corbin v. Camden Coca-Cola Bottling Co., 60 N.J. 425 (1972); Prosser, Law of Torts (4th ed. 1971) § 103. [Scanlon v. General Motors Corp., 65 N.J. 582, 590 (1974); footnote omitted.]
A product is defective if it is not fit for the ordinary purposes for which such articles are sold and used. Scanlon v. General Motors, supra, 65 N.J. at 591; Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 66-67 (1965). The defect must have been present while the product was in the control of the manufacturer or retailer being sued. This may be established by direct evidence that the product *431 was defective because of a manufacturing flaw or inadequate design, or other evidence which would permit an inference that a dangerous condition existed prior to sale. Jakubowski v. Minnesota Mining & Mfg., 42 N.J. 177, 183-184 (1964). Thus, the defective condition can be proven by the testimony of an expert who examined the product or who offers an opinion on the product's design. Scanlon v. General Motors Corp., supra, 65 N.J. at 591.
In order for plaintiff to sustain his burden, he was required to prove not only that the windshield wiper assembly on the 1969 Volkswagen was defective but that the defect arose while in the control of defendants. Plaintiff presented expert testimony which, although contested, tended to show that the windshield wiper assembly on the 1969 Volkswagen he was driving was defectively designed because the method of attachment of the wiper arm to the wiper shaft was dependent upon a set screw being properly torqued, and that it was not properly torqued, thereby permitting the wiper arm to slip or fail under the weight of the slush. This claimed defect was the specific subject of the recall letters issued by defendants. These letters clearly are relevant on the issue of whether the defect arose while the vehicle was in the control of defendants. The recall letters have a logical connection with and tend to establish the existence of this essential fact. In the circumstances the letters were evidential on the issue of when the defect arose and should have been admitted in evidence with a limiting instruction by the trial judge as to the purpose for which the letters could be considered by the jury.
We do not perceive that either the letter or the spirit of Evid. R. 51 mandates the exclusion of the recall letters from evidence. Evid. R. 51 provides:
When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. *432 While evidence of subsequent remedial or precautionary conduct is inadmissible to prove negligence or culpable conduct in connection with a previous event (see Rynar v. Lincoln Transit Co., Inc., 129 N.J.L. 525, 530 (E. & A. 1943); Price v. Buckingham Mfg. Co., Inc., 110 N.J. Super. 462, 464-465 (App. Div. 1970)), it may be relevant for other purposes. Remedial or precautionary measures taken after the occurrence of an event have been held to be admissible to show control or to prove that a defect existed at a particular point in time. See Perry v. Levy, 87 N.J.L. 670, 672 (E. & A. 1915); Reid v. Monmouth Oil Co., 42 N.J. Super. 355, 362-363 (App. Div. 1956). Here, the recall letters were not offered to establish the negligence or culpability of defendants, but only to show that the defect established by expert testimony had its origin while the vehicle was in defendants' control.
The result we reach here is supported by Fields v. Volkswagen of America, Inc., 555 P.2d 48 (1976), where the Oklahoma Supreme Court upheld the admissibility of a recall letter issued by Volkswagen, when the defect which plaintiff showed to have caused the accident was the same defect which was the subject of the recall letter. The court held that the recall letter was relevant and was therefore admissible as some evidence that the defect existed when the product left the manufacturer, stating:
* * * Title 15 U.S.C. § 1402 which is a section of The 1966 Traffic and Motor Vehicle Safety Act, requires every manufacturer of a motor vehicle to furnish notice to the purchaser of any defect in the vehicle which might relate to motor vehicle safety. This provision is the basis of the many "recall campaigns" brought about by governmental or quasi governmental agencies. Public policy would seem to prohibit indiscriminate use of the letters for the same reason that evidence of subsequent repairs is not admissible. A defendant should not be penalized for obeying the law, but where the plaintiff shows independently there is such a defect, the dangers inherent in recall evidence are small and the introduction of a recall letter does not constitute reversible error.
Appellants claim that the recall letter is irrelevant. They claim it is the "longitudinal pin," not the "guide pin," that must malfunction *433 before the steering will lock. Appellee agrees that the basic question is one of relevancy and that the usual rules of evidence should apply. If the defect mentioned in the recall letter is not the defect claimed to have caused the accident then the letter is irrelevant and inadmissible. The plaintiff is required to present testimony that the described defect actually existed. Where plaintiff's theory does not depend upon the defect described in the letter the recall evidence is clearly irrelevant. Evidence of recall, standing alone is not sufficient to sustain a verdict against the defendant.

* * * * * * * *
The recall letter by itself does not make a prima facie case or shift the burden of proof. It does not prove that the defect existed at the time of the accident. This must be proved independently. But if a defect contributing to or causing the accident is the defect that is the subject of the recall letter, then the letter would be some evidence that the "defect existed at the time the product left the manufacturer." This is an element that the plaintiff is required to prove. [at 57-58, footnotes omitted]
Similarly, in Barry v. Manglass, 55 A.D.2d 1, 389 N.Y.S. 2d 870 (1976), the Appellate Division held recall letters are admissible in evidence where the defect referred to therein is established by independent expert testimony to be the cause of the accident. The court held that such evidence, while not an admission that the vehicle was defective, was evidential on the issue of whether the established defect existed while in the manufacturer's control, stating:
* * * [S]ince the plaintiff is required to prove that the defect existed not only at the time of the accident but also at the time when the product left the hands of the manufacturer (see Prosser, Torts [4th ed.], pp. 671-672), we believe that the relevancy of the recall letters outweighs any possible prejudice in their receipt; a jury is entitled to know that the existence of the defect in a particular model of vehicle was likely and that such likelihood was greater as to such model that it was as to other models (cf. Sutkowski v. Universal Marion Corp., 5 Ill. App.3d 313, 281 N.E.2d 749, supra; Glynn Plymouth v. Davis, 120 Ga. App. 475, 170 S.E.2d 848, aff'd 226 Ga. 221, 173 S.E.2d 691; Landry v. Adam, 282 So.2d 590 [La. App.]).
As an additional answer to General Motors' public policy argument (that the admission of such recall letters would discourage manufacturers from announcing a possible defect), it is merely necessary to point out that such announcement was not a voluntary *434 act, but one mandated by Federal statute (see Motor Vehicle Safety Act of 1966, supra).
True it is that some prejudice is inevitable in such a case, but it can, and should, be minimized by the court's caveat, at the time of its receipt in evidence, and when charging the jury, that such letters do not establish that the defect was present in the particular vehicle. Thus, to sustain a verdict for a plaintiff based upon an existing defect, such letters, standing alone, would be insufficient. Here, however, we have the testimony of plaintiff's experts (albeit contradicted by that of General Motors' expert witnesses), which was not unbelievable, and which justified the jury's conclusion that the defect existed prior to the accident and that it caused the accident. The statements contained in the letters could therefore properly be utilized by the jury as confirmation of that testimony. [389 N.Y.S.2d at 876-877]
See also, Higgins v. General Motors Corp., 250 Ark. 551, 465 S.W.2d 898, 900 (Sup. Ct. 1971); Ault v. International Harvester Co., 13 Cal.3d 113, 117 Cal. Rptr. 812, 528 P. 2d 1148 (Sup. Ct. 1974).
Finally, we disagree with the holding in Landry v. Adam, 282 So.2d 590 (La. App. 1973), relied upon by defendants to support their argument that the recall letters were inadmissible. In Landry the Louisiana court held, for reasons of public policy, that the evidence of or reference to a recall campaign was an improper method of proving that a similar defect existed in the subject vehicle when it left the manufacturer's hands even though it pointed out that once the defect was proven and expert testimony established that other similar cars contained the same defect such evidence would be relevant to that issue. See Vockie v. General Motors Corp., Chevrolet Div., 66 F.R.D. 57, 61-62 (E.D. Pa. 1975), aff'd 523 F.2d 1052 (3 Cir.1975).
We also recognize that other cases, as pointed out by defendants, have held recall letters to be inadmissible. However, the holdings in these cases for the most part are predicated upon a finding that the defect described in the recall letter was not proven to exist in the vehicle which was the subject matter of the suit or was not the same defect claimed to have caused the accident. Thus, for example, in Kane v. Ford Motor Co., 450 F.2d 315 (3 Cir.1971), a Court *435 of Appeals upheld a trial judge's ruling that a service letter sent by Ford to its dealers warning that in certain Ford vehicles some front brake wheel supports may have been bent out of proper position was inadmissible because it was not relevant to the theory of plaintiffs' case. There plaintiff presented no testimony that the condition described in the service letter existed on the subject vehicle. Cf. Glynn Plymouth, Inc. v. Davis, 120 Ga. App. 475, 170 S.E.2d 848, 851 (Ct. App. 1969).
Accordingly, we hold that, in the circumstances of this case, the recall letters were properly admissible in evidence for the limited purpose of determining whether the defect identified by plaintiff's expert witness arose while the vehicle was in the control of defendants, and that the trial judge erred in refusing to admit them in evidence. We are also satisfied from our study of the entire record that the error was prejudicial, requiring a reversal of the judgment in favor of defendants and remand to the trial court for a new trial. Accordingly, the judgment of the Law Division is reversed and the matter is remanded for a plenary hearing consistent with the views expressed in this opinion.
NOTES
[1] Summary judgment was entered prior to trial by consent in favor of defendant World Wide Distributors, Inc., and against plaintiffs and the other defendants above-named on the basis of a stipulation of facts.