977 So.2d 594 (2007)
SHANDS TEACHING HOSPITAL AND CLINICS, INC., Appellant,
v.
Michael Adam DUNN and Kathie Lynette Dunn, individually and as co-personal representatives of the estate of Michael Dylan Dunn, Appellees.
No. 1D06-4086.
District Court of Appeal of Florida, First District.
November 20, 2007.
Rehearing Denied March 27, 2008.
*595 Susan L. Kelsey of Anchors Smith Grimsley, Tallahassee, for Appellant.
Rebecca Bowen Creed of Mills & Creed, P.A., Jacksonville; Alan E. McMichael of Stripling, McMichael & Stripling, P.A., Gainesville, for Appellees.
PADOVANO, J.
The defendant, Shands Teaching Hospital & Clinics, Inc., appeals a final judgment entered on a jury verdict awarding $2 million to the plaintiffs, Michael and Kathie Dunn, for medical negligence in connection with the death of their son, Dylan. The plaintiffs alleged that a hospital nurse, Susan Lim, failed to properly monitor Dylan's condition following open heart surgery and that she gave him an excessive amount of a powerful medication known as Digoxin. We reverse the judgment on two grounds, either of which would require a new trial.
First, the trial court erred in excluding evidence that the hospital had a routine practice of requiring the attendance of two nurses when drugs such as Digoxin are administered, in order to ensure that the patient receives the prescribed dosage. The evidence of this practice may have made a difference in the outcome of the case, given the fact that there was no direct evidence that Nurse Lim gave the child more than the prescribed dose. Second, the trial court erred in denying the hospital's motion to continue the trial until such time as Nurse Lim could appear in court to testify in person before the jury. Because Nurse Lim's alleged negligence was the centerpiece of the case, the hospital should have been allowed to defend itself by presenting her testimony directly to the jury. In this situation, we conclude that the trial court abused its discretion by denying the hospital's motion for a continuance.
Dylan was born with a heart defect known as tricuspid atresia, a condition in which the tricuspid valve is not properly formed and impedes blood flow and normal heart function. This defect is corrected surgically by the Fontan procedure, which is actually a series of three surgical procedures performed in sequence over the course of the first few years of the child's life. The Fontan procedure is risky, but a child born with a tricuspid atresia cannot survive without it.
The controversy in this case arose from the medical care Dylan received in the pediatric intensive care unit at the hospital following the third procedure. He was fairly stable on the first day after surgery, but on the second day he developed a *596 rapid heartbeat and an abnormal heart rhythm. He was suffering from a form of tachycardia that develops as a post-surgical complication in fifteen to twenty percent of the children who have the Fontan procedure. The condition is not only difficult to treat, it is also serious, in that it impairs the functioning of the heart.
The doctors tried a number of corrective measures, but nothing proved to be effective in slowing Dylan's heart rate or correcting his abnormal heart rhythm. They gave him a saline-type solution to build up the volume of the heart, they sedated him with a dose of morphine, and then they administered a series of other drugs that are ordinarily used to correct heart arrhythmias. When these measures failed, they prescribed Digoxin.
Digoxin can improve the pumping action of the heart, but this potential benefit comes with risks. One possible adverse consequence of the drug is that it may cause the concentration of potassium in the patient's blood to rise to an unsafe level. Another consideration is that the drug is said to have a narrow therapeutic range: the difference between a safe, effective dose and a toxic dose is relatively small. For these reasons, the hospital controls access to Digoxin. It can be obtained only from a special dispensing machine that requires a user name and password.
Dylan was to receive a total of 450 micrograms of Digoxin, with an initial dose of 225 micrograms to be followed by two doses of 112.5 micrograms over the course of the next two days. When the order was given, Nurse Lim obtained an ampule of Digoxin from the dispensing machine. The procedure at that point would be to measure out the initial dose from the ampule and to administer it to the patient.
Nurse Lim gave Dylan the initial dose of Digoxin, but she incorrectly charted the dose as 225 milligrams instead of 225 micrograms. The parties agree that the charted amount could not have been correct, as the entire ampule contained only 500 micrograms. However, the amount that was given could not be calculated by the amount that remained in the ampule, because the unused portion was eventually destroyed as medical waste, and Digoxin is not within the class of drugs that requires a destruction record.
Dylan's potassium level had been higher than normal throughout the day and, when the initial dose of Digoxin was administered, it began to rise even higher. It continued to rise for the next seventy-five minutes, at which point he went into cardiac arrest. Doctors tried for several hours to resuscitate him by various means but they were ultimately unable to restart his heart.
In their complaint against the hospital, the plaintiffs alleged that Nurse Lim was negligent, in that she failed to properly monitor Dylan's condition after his surgery. They-contend that, as a result of this negligence, the doctors were not able to take the proper action to save Dylan's life. Relying in part on the opinions of other doctors, the plaintiffs also alleged that Nurse Lim administered an overdose of Digoxin, which caused a rapid and uncontrolled increase in Dylan's potassium level. This, they maintain, was the underlying cause of his death.
The trial began as scheduled in October 2005, but, after the jury had been selected and sworn and the parties had presented several days of testimony, the presiding judge was disqualified. This required a mistrial, and the case was then assigned to another judge and rescheduled for a jury trial on June 5, 2006.
Nurse Lim testified as a defense witness in the first trial, but the parties soon learned that she might not be available for *597 the second trial. On February 20, 2006, counsel for the hospital informed the successor judge that Nurse Lim was pregnant and that she was due to deliver her baby on June 7, 2006. He feared that she might not be able to attend the second trial, a concern the trial judge apparently shared. The judge noted that it would be important to have Nurse Lim appear in person. As he explained, "I just trust that you all probably want her live. One of the things that I'm going to be encouraging . . . is live witnesses. I know you've already done a trial, but there's nothing worse than re-plowing the ground with nothing but depositions and reading to the jurors." The judge ended the discussion on this point by telling the lawyers that he would deal with the issue later.
On March 20, 2006, the hospital moved for a continuance on the ground that Nurse Lim would not be available to testify in person. She was living in another city by then, and her doctors had advised her that she could not travel during the early part of June. The judge denied the motion, explaining that, although he preferred live testimony, he was "somewhat in error" to suggest that the trial would be continued because of Nurse Lim's pregnancy. The judge suggested that finding an alternative date would be too burdensome, and the parties then made arrangements to have Nurse Lim appear for a video deposition to be used in place of live testimony.
In her video deposition, Nurse Lim stated that she had cared for many sick children during her time at the hospital. She did not remember Dylan but she was able to offer pertinent information about his medical care from her review of the nursing charts and her knowledge of the hospital's procedures. She testified that she had removed a 500-microgram ampule of Digoxin from the dispensing machine and that she had used a calculator to convert the dosage to a fluid measurement. She explained that the calculations are very simple. The drug is dissolved in a solution. Given the fact that 250 micrograms of Digoxin would be the equivalent of one cubic centimeter of the solution, she used the calculator to conclude that the liquid measurement of the prescribed dose would be 9 cubic centimeters. She said she was certain this was the amount of Digoxin she had given to Dylan.
In the course of the video deposition, Nurse Lim also testified that the hospital has a policy of double checking the dosage of certain drugs including Digoxin, before they are administered to patients. The practice is to require that a second nurse review the calculation and measurement, to make sure that the dosage is correct. Nurse Lim testified that it was her routine to double check with another nurse before administering drugs, such as Digoxin, that are subject to this policy. She said that other nurses followed the practice, as well. Other nurses had checked her work many times before, and vice versa.
When the parties first asked the court to review Nurse Lim's deposition to consider the various objections by the plaintiffs, the trial judge determined that the evidence pertaining to the hospital's policy of double checking would be admissible. However, during the course of the trial, the judge reversed course on this point and ruled that there would be no testimony concerning the policy. Thus, the jurors were not informed that Nurse Lim would have been required to have another nurse present to check her calculations against the doctor's prescription.
Medical experts for the plaintiffs testified that blood tests done during Dylan's autopsy were consistent with the conclusion that he had died of an overdose of Digoxin. The plaintiffs' experts were of *598 the opinion that the levels of Digoxin found in his blood suggested that he had been given more than the 225 micrograms of Digoxin he was supposed to receive as the initial dose. They concluded that the rapidly rising potassium levels that ultimately caused Dylan's death resulted from an excessive amount of Digoxin.
In contrast, the hospital's experts testified that Dylan's congenital heart disease and the trauma of his recent surgery had caused the increase in his potassium level. They accepted the possibility that an excessive amount of Digoxin could have caused a marked increase in potassium, but they believed that Dylan's potassium level was so high that it was more likely produced in his body as a consequence of his medical condition. The jury rejected this explanation and found for the plaintiffs.
Whether the trial court erred in excluding the evidence of a routine practice is an issue of law. We acknowledge that many issues pertaining to the admission or exclusion of evidence are subject to review by the abuse of discretion standard. However, the de novo standard applies if the issue presented on appeal is whether the trial court erred in applying a provision of the Florida Evidence Code. See McCray v. State, 919 So.2d 647, 649 (Fla. 1st DCA 2006); Burkey v. State, 922 So.2d 1033 (Fla. 4th DCA 2006). If the hospital's policy of requiring two nurses qualifies as a routine practice of an organization as defined in the Florida Evidence Code, the hospital would be entitled to present evidence of the policy. There was no dispute regarding the factual predicate for the admission of the policy; it either qualifies under the Evidence Code as a routine practice or it does not. Hence, we conclude that the issue is one of law.
The policy in this case could have been proven either by documentary' evidence or by witness testimony. However, we confine our consideration to the proposed testimony, inasmuch as the document memorializing the policy was not proffered in evidence during the second trial.[1] Unlike the documentary evidence, the testimony was proffered. The hospital offered in evidence Nurse Lim's video deposition, which included her explanation of the procedure for administering Digoxin.
The plaintiffs contend that the issue regarding Nurse Lim's testimony is not preserved for review, because the hospital initially prevailed on this point and then failed to object when the trial court decided to exclude the evidence during the course of the trial. However, our review of the record reveals that the hospital did object to the exclusion of this evidence. It is clear at several points in the record that the hospital took the position that it should have been allowed to present Nurse Lim's testimony that two nurses would have been present. Hence we conclude that the issue was properly preserved for review.
That leaves us to decide whether the trial court erred by excluding the proposed evidence of the hospital's practice. To answer this question, we turn first to the applicable statute. Section 90.406, Florida Statutes states,
Evidence of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is admissible to prove that *599 the conduct of the organization on a particular occasion was in conformity with the routine practice.
§ 90.406 Fla. Stat. (2007). The existence of a routine practice creates an inference that an agent or employee of the organization acted according to the practice. See Tabb v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 880 So.2d 1253, 1259 (Fla. 1st DCA 2004). In the absence of contrary evidence, jurors may properly assume that an employee has adhered to established procedures.
Prior to the enactment of the Evidence Code, some courts held that proof of a routine practice was admissible only if there were some independent evidence that the practice was followed at the time of the event in question. See Charles W. Ehrhardt, Florida Evidence § 406.1 (2007 ed.). However, it is clear from the text of section 90.406 and the applicable cases that evidence of a routine practice is now admissible without such a showing. See Progressive Am. Ins. Co. v. Kurtz, 518 So.2d 1339 (Fla. 5th DCA 1987). This rule places evidentiary value on the practice itself.
The present case illustrates the reason for the rule. Nurse Lim could not remember Dylan in particular, and she could not say from her memory alone that she gave him gave him 225 micrograms of Digoxin, as the doctors had ordered. Nor could this be proven by the nursing chart. At best, the chart would show the amount of Digoxin she believed she had given him. Yet the jurors might have concluded that she gave Dylan precisely 225 micrograms of the drug, had they known that there would have been another nurse present for the purpose of ensuring that Nurse Lim administered the correct dosage.
The evidence of the hospital's routine practice would have served to forcefully rebut the plaintiffs' claim that Nurse Lim administered an overdose of Digoxin. The trial court erred in excluding this evidence, and because there was no direct proof of the alleged overdose, we are not able to say that the error was harmless. Although this point alone would warrant reversal, we believe that the trial court also committed reversible error by denying the hospital's motion for a continuance.
Whether to grant or deny a motion to continue a trial is a matter that rests within the sound discretion of the trial judge. Therefore, Florida courts have held that a judgment should not be reversed on appeal on the ground that the trial court ruled improperly on a motion for continuance, unless the ruling amounts to an abuse of discretion. See Carpenter v. Carpenter, 451 So.2d 914, 916 (Fla. 1st DCA 1984); Fasig v. Fasig, 830 So.2d 839, 841 (Fla. 2d DCA 2002).
A ruling on a motion for continuance is treated with a relatively high degree of deference, even among other kinds of discretionary decisions. The Florida Supreme Court has noted that a reversal on the ground that the trial court erred in denying a motion for a continuance requires a "clear showing of a palpable abuse of . . . judicial discretion." Webb v. State, 433 So.2d 496, 498 (Fla.1983). We take this to mean that the court has required even greater deference to continuance orders than is required of other discretionary rulings.
In light of this standard, we acknowledge that a reversal for failure to grant a motion for continuance would be justified only in very rare situations. However, there are indeed cases in which the appellate court will have no alternative but to reverse, because the injustice caused by the denial of the motion outweighs the judicial policy of deferring to the trial judge. See, e.g., Silverman v. *600 Millner, 514 So.2d 77, 78 (Fla. 3d DCA 1987). In our view, this is one of those cases.
The need for a continuance in this case was compelling. Nurse Lim was pregnant and her doctor had ordered her not to travel. This was not a problem of the hospital's making. Likewise, the hospital could not have offered an effective solution to the problem. No other witness could have given testimony that would have been as effective as Nurse Lim's live explanation to the jury.
Nor does it appear that the reasons for denying the motion outweighed the reasons for granting it. In our view, there was no good reason to deny the motion. The trial judge said that it would be too burdensome to find another trial date. That might have been a legitimate reason to deny a continuance if the hospital had waited until the last minute to seek a continuance on grounds that could have been asserted earlier. However, in this case the hospital informed the court that Nurse Lim would be unavailable more than three months before the trial, at a time when it would have been possible to reschedule the trial without any disruption.
We would be more inclined to excuse the error in denying the motion for continuance if Nurse Lim were not such an important witness. The claim against the hospital was based entirely on the allegation that Nurse Lim was negligent. She stood in the shoes of the hospital, and her testimony would have given voice to the hospital's defense. If the jury believed Nurse Lim's statement that she monitored Dylan's condition properly and gave him the correct amount of Digoxin, the hospital would have prevailed. Yet the jury did not have the advantage of observing her live testimony. The denial of the motion for continuance deprived the hospital of the opportunity to put Nurse Lim on the witness stand so she could explain herself to the jury in person.
For these reasons, we conclude that the judgment must be reversed and that the hospital is entitled to a new trial. In light of this disposition, we find it unnecessary to address any of the other issues presented, except to say that we reject the hospital's argument that the trial court erred in denying its motion for a directed verdict. Had the hospital succeeded on that point, it would have been entitled to a judgment in its favor, not merely a new trial.
Reversed and remanded.
ALLEN and VAN NORTWICK, JJ., concur.
NOTES
[1] The document entitled, "Medical Administration Policy," states that two nurses must be present when Digoxin is administered to a patient, to ensure the correct concentration and dosage. This document was attached to the deposition Nurse Lim gave before the first trial and it was introduced by the plaintiffs in the first trial. However, for reasons that are not clear to us, neither party offered it as an exhibit in the second trial.